# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
January 19, 2012 Session

## STATE OF TENNESSEE v. RALEIGH KRISTOPHER FRYE

**Appeal from the Circuit Court for Coffee County**
**No. 37381     Vanessa Agee Jackson, Judge**

---

**No. M2011-00395-CCA-R3-CD - Filed May 9, 2012**

---

A Coffee County Circuit Court jury convicted the defendant, Raleigh Kristopher Frye, of one count of third offense driving under the influence ("DUI"), and the trial court found the defendant guilty of violating the implied consent law.  In this appeal, the defendant challenges the trial court's denial of his motion to suppress evidence obtained following the stop of his vehicle and the sufficiency of the convicting evidence, claims that the trial court committed reversible error by permitting the State to exercise four peremptory challenges and by permitting the indictment for the implied consent violation to be taken to the jury room, and contends that the cumulative effect of the errors at trial entitles him to a new trial. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined.  JERRY L. SMITH, J., not participating.

Doug Aaron (at trial and on appeal); and C. Brent Keeton (on appeal), Manchester, Tennessee, for the appellant, Raleigh Kristopher Frye.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; C. Michael Layne, District Attorney General; and Marla Holloway, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant's convictions in this case stem from a traffic stop conducted in Tullahoma in the early morning hours of March 11, 2009.  Tullahoma Police Department ("TPD") Sergeant Phillip Henderson testified at trial that he encountered the defendant at

approximately 1:00 a.m. on that date as they traveled in opposite directions on Wilson Avenue. Sergeant Henderson said that the defendant's headlights were not on despite the late hour, so the sergeant turned around to follow the defendant's vehicle. As the defendant came to an intersection, the defendant briefly turned into the opposite lane of travel. The defendant then crossed the center line twice for several seconds. At that point, Sergeant Henderson activated his emergency equipment and initiated a traffic stop. Sergeant Henderson maintained that the defendant's headlights remained off during the entire time he followed the defendant and for the duration of the traffic stop.

Sergeant Henderson acknowledged that the defendant's crossing the center line was smooth and that it occurred on the first occasion where some gravel had spilled into the roadway from an adjacent driveway and on the second occasion where the roadway was intersected by another road.

TPD Officer Kevin Smith, who took over the stop from Sergeant Henderson, testified that as soon as he arrived, he approached the defendant's car and asked for the defendant's license, registration, and proof of insurance. Officer Smith said that the defendant was "calm and very polite," but the officer "noticed a strong odor of an intoxicating beverage about his breath and person, and in the cupholder was an open can of beer." Officer Smith recalled that the defendant admitted having consumed "six or seven" beers throughout the day. Officer Smith then asked the defendant to perform several field sobriety tests. According to Officer Smith, the defendant exhibited several signs of impairment during the tests. Specifically, the defendant started and stopped too soon, missed a step, performed an improper turn, and took too many steps while attempting the walk-and-turn test. Additionally, the defendant swayed and repeated numbers as he was counting during the one-legged stand test. During the "Romberg balance" test, the defendant swayed and went over the time alotted, and during the "finger-to-nose" test, he swayed and touched "the side of his nose and his upper lip" rather than the tip of his nose. Finally, during a counting and dexterity exercise, the defendant failed to count backwards properly.

Based upon the defendant's driving and his performance on the field sobriety tests, Officer Smith placed the defendant under arrest for DUI. Officer Smith then read the implied consent form to the defendant and asked the defendant to submit to blood alcohol testing. After a lengthy discussion, the entirety of which was recorded and played for the jury, the defendant refused to submit to blood alcohol testing and signed the form indicating his refusal.

The State rested, and the defendant presented the testimony of Coffee County Corrections Lieutenant Ann Welch, who testified that the medical intake form completed after the defendant was incarcerated on March 11, 2009, indicated that the defendant did not

appear to be under the influence. During cross-examination, however, Lieutenant Welch acknowledged that she did not complete the form and that it was most likely completed by a jailer with no training in DUI detection.

Teresa Hulen, an employee for the company that posted the defendant's bond, testified that she had previous experience as a patrol officer and had been trained in DUI detection. She said that the defendant did not appear to be under the influence of alcohol when she spoke to him at the Coffee County Jail on March 11, 2009. She said that his speech was not slurred and that there was no odor of alcohol about his person. She acknowledged, however, that her encounter with the defendant occurred several hours after his arrest.

Eccho Staples testified that on March 10, 2009, she had lunch with the defendant at Crockett's restaurant, and the two then went to the defendant's house, where they played cards and drank beer. Ms. Staples said that the defendant consumed "four or five" beers before she left his residence at 5:30 p.m. Later that evening, Ms. Staples returned to Crockett's with friends, where she consumed alcoholic beverages until she felt "buzzed." At that point, she sent a "text" message to the defendant asking him to join her at Crockett's and stay with her until she felt sober enough to drive. The defendant complied and drank a single draft beer while waiting with Ms. Staples. Sometime after midnight, the two drove to Krystal's restaurant, where they ordered food from the drive-thru and ate in the car. After they ate, the defendant drove Ms. Staples back to her car, which was parked at Crockett's. They left the parking lot with Ms. Staples driving her vehicle and the defendant following her in his vehicle.

At some point, Ms. Staples noticed that the defendant's headlights were off, so she sent him a "text" message telling him to turn his lights on. She said that the defendant complied immediately. Ms. Staples confirmed Sergeant Henderson's account of the defendant's driving, but she said that she, too, had cut the corner at the intersection and crossed the center line to avoid road debris.

The defendant testified that he ate lunch with Ms. Staples and some other friends on March 10, 2009, before going to his house, where they played cards, cleaned out the defendant's car, and drank beer. The defendant said that he consumed four full beers and half of a fifth beer before Ms. Staples left. After she left, he watched television while snacking on potato chips and soft drinks. At approximately 10:30 p.m., Ms. Staples sent him a "text" message asking him to meet her at Crockett's, and he complied. The defendant insisted that he felt no effects from the alcohol he had consumed earlier in the day when he left to meet Ms. Staples at Crockett's. He said that he consumed a ten ounce draft beer while at Crockett's. After midnight, he took Ms. Staples to Krystal's, and they ate while sitting in the car. He then took her back to her car, and they left in separate vehicles.

The defendant recalled that Ms. Staples sent him a "text" message telling him to turn on his headlights and that he turned them on immediately after reading the message. The defendant acknowledged cutting the corner at the intersection, but he claimed that it was necessary because of the angle of the two roads. He also acknowledged crossing the center line on two occasions, but he said that he did so on the first occasion to avoid road debris and on the second to avoid the jagged pavement at the intersection of two roads. The defendant said that he was surprised when stopped by Sergeant Henderson and even more surprised when he was placed under arrest for DUI. He said that he did not feel impaired and that he "felt comfortable taking sobriety tests." The defendant testified that he refused to submit to blood alcohol testing because Officer Smith said that he could be convicted of DUI despite a low reading.

Anthony Palacios, a "law enforcement consultant" with previous experience and training in DUI enforcement, testified as an expert in the administration and scoring of field sobriety tests. Mr. Palacios said that Officer Smith did not administer either the walk-and-turn or the one-legged stand in the standardized manner provided by the National Highway Traffic Safety Administration ("NHTSA"). He said that the officer's failure to medically qualify the defendant for either test and his failure to provide the standardized instructions compromised the validity of the tests. Mr. Palacios testified that the "Romberg" test was not designed for alcohol detection and that NHTSA researchers were unable to establish any correlation between performance on the finger counting test and blood alcohol level.

Forensic toxicologist Doctor Jerry McMahan testified that based upon the defendant's testimony about the amount of alcohol he had consumed and the period over which he claimed to consume it, the defendant's blood alcohol level would have been "at 0" by the time he consumed the single ten-ounce beer at Crockett's. That beer, Doctor McMahan said, would not have raised his blood alcohol level appreciably. Doctor McMahan testified that by 1:00 a.m., the time of the stop, "there would be no blood alcohol detectible in the defendant's system." Because there would have been no detectible blood alcohol, the defendant would have had no impairment. Doctor McMahan acknowledged during cross-examination that all of his calculations were dependent upon the defendant's veracity.

Based upon this proof, the jury convicted the defendant of DUI. The defendant stipulated that he had been previously convicted of DUI twice, and the trial court imposed a conviction of DUI, third offense. The trial court also found the defendant guilty of an implied consent violation. Following a sentencing hearing, the trial court imposed a sentence of 11 months and 29 days to be served as 120 days' incarceration followed by probation. The trial court also ordered the defendant's driver's license revoked for three years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal in this court. In this appeal, the defendant contends that the trial court erred by denying his motion to suppress the evidence obtained from the stop of his vehicle on March 11, 2009, that the trial court erred by permitting the State to exercise four peremptory challenges, that the trial court erred by permitting the indictment for the implied consent violation to go to the jury room, that the evidence was insufficient to support his conviction of third offense DUI, and that the cumulative effect of the errors deprived him of the right to a fair trial. We consider each claim in turn.

## *I. Motion to Suppress*

The defendant claims that the trial court should have suppressed the evidence obtained during the traffic stop on March 11, 2009, because Sergeant Henderson lacked reasonable suspicion to stop his vehicle. The State asserts that the defendant's driving without his headlights illuminated and crossing the center line on two occasions provided the officer with reasonable suspicion to initiate the traffic stop. We agree.

At the suppression hearing, Sergeant Henderson testified, as he did at trial, that he initially followed the defendant after observing his driving without his headlights on just before 1:00 a.m. on March 11, 2009. As he followed the defendant, Sergeant Henderson saw the defendant "turn[] short" at an intersection and then cross the center line on two occasions. Sergeant Henderson said that he did not activate his emergency equipment immediately after he observed the defendant driving without his headlights on because he wanted to observe the defendant's driving and because "there was really no safe place" for the defendant to pull over.

The defendant's suppression hearing testimony was nearly identical to his trial testimony. He admitted that he drove for a short distance with his headlights off, explaining that he turned them on immediately after receiving a message from Ms. Staples telling him that they were off. He also admitted that he "took the corner" at the intersection and crossed the center line on two occasions.

Ms. Staples testified that she noticed that the defendant's headlights were off as he followed her home. She sent him a message telling him to turn them on, and the defendant turned his lights on immediately. Ms. Staples acknowledged that the defendant crossed the center line, but she said that she crossed the center line in the same location to "dodge all that stuff" in the roadway.

At the conclusion of the hearing, the trial court denied the defendant's motion to suppress, concluding that "the totality of what Officer Henderson saw," including the

defendant's driving without his headlights on "for some period of time" and his crossing the center line "on a couple occasions," provided the officer with reasonable suspicion to conduct a traffic stop.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). We review the trial court's conclusions of law under a de novo standard without according any presumption of correctness to those conclusions. *See, e.g.*, *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). We review the issue in the present appeal with these standards in mind.

Because stopping an automobile without a warrant and detaining its occupants unquestionably constitutes a seizure, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), the State in the present situation had the burden of demonstrating the applicability of an exception to the warrant requirement, s*ee, e.g.*, *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (temporary detention of an individual during a traffic stop constitutes seizure that implicates the protection of both the state and federal constitutions); *State v. Keith*, 978 S.W.2d 861, 865 (Tenn. 1998). The authority of a police officer to stop a citizen's vehicle is circumscribed by constitutional constraints. Police officers are constitutionally permitted to conduct a brief investigatory stop supported by specific and articulable facts leading to reasonable suspicion that a criminal offense has been or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2002). Whether reasonable suspicion existed in a particular case is a fact-intensive, but objective, analysis. *State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003). The likelihood of criminal activity that is required for reasonable suspicion is not as great as that required for probable cause and is "considerably less" than would be needed to satisfy a preponderance of the evidence standard. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). A court must consider the totality of the circumstances in evaluating whether a police officer's reasonable suspicion is supported by specific and articulable facts. *State v. Hord*, 106 S.W.3d 68, 71 (Tenn. Crim. App. 2002). The totality of the circumstances embraces considerations of the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts on which the law enforcement officer relied in light of his experience. *See State v. Pulley*, 863 S.W.2d

29, 34 (Tenn. 1993). The objective facts on which an officer relies may include his or her own observations, information obtained from other officers or agencies, offenders' patterns of operation, and information from informants. *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

Although Ms. Staples and the defendant testified that the defendant turned his lights on before the stop and attempted to attribute his crossing the center line to his attempt to avoid road debris, both acknowledged that the defendant drove without his headlights on for some period of time and crossed the center line on at least two occasions. These facts support the trial court's conclusion that Sergeant Henderson had reasonable suspicion to stop the defendant's vehicle. *See* T.C.A. §§ 55-9-406(a) ("The headlights shall be displayed during the period from one half (1/2) hour after sunset to one half (1/2) hour before sunrise, during fog, smoke, or rain and at all other times when there is not sufficient light to render clearly discernible any person on the road at a distance of two hundred feet (200') ahead of the vehicle."); -8-123(1) ("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety[.]").

## *II. Peremptory Challenges*

The defendant next contends that the trial court erred by permitting the State to exercise four peremptory challenges in this misdemeanor case in contravention of Tennessee Code Annotated section 40-18-118 and Tennessee Rule of Criminal Procedure 24. The State asserts that the defendant waived appellate consideration of this error by failing to lodge a contemporaneous objection to the award of peremptory challenges and by failing to include a complete transcription of the jury selection process. The State also contends that the defendant has failed to establish that the trial court committed plain error.

As the State correctly points out, the defendant failed to lodge a contemporaneous objection to the State's exercise of four peremptory challenges. At the beginning of voir dire, the trial court, upon a question by the prosecutor, informed the parties that each side would be permitted four peremptory challenges because the court intended to seat twelve jurors and an alternate. Not only did the defendant fail to object to this award of challenges, which followed precisely the mandates of Tennessee Rule of Criminal Procedure 24(e)(4), he agreed to it.[1] Moreover, even after the State exercised its fourth challenge, the defendant raised no objection. At some point, it became clear that the court would not be

---

[1] The defendant cites to Rule 24(e) in his brief but deliberately omits subsection (4), which references the award of an additional challenge for the selection of an alternate juror.

able to seat an alternate because too few people reported for jury duty.[2]  The defendant still did not object to the provision of peremptory challenges.  The defendant cannot now be heard to complain that the trial court erred in this respect.  *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987).  Finally, we find it unnecessary to review this issue via plain error because the defendant has failed to satisfy the criteria for plain error review. *See State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000).

### *III.  Copy of Indictment Charging Implied Consent Violation*

The defendant next complains that he was deprived of the right to a fair and impartial jury because the jury was exposed to extraneous, prejudicial information in the form of a copy of the second count of the indictment charging the defendant with an implied consent violation.  The State asserts that the defendant is not entitled to relief on this issue because the exposure was inadvertent and because the information contained in the indictment was admitted by the defendant during his testimony.

Citing *State v. Malinda L. Mason*, No. M2005-01961-CCA-RM-CD (Tenn. Crim. App., Nashville, Nov. 16, 2004), the defendant asserts that the second count of the indictment, which charged a violation of the implied consent statute, constituted extraneous prejudicial information and that its being taken into the jury room with the other exhibits raised a presumption of prejudice that the State failed to overcome.  Also citing *Mason*, the State concedes that the implied consent violation indictment was extraneous, prejudicial information but argues that it overcame any prejudice.  In *Mason*, Mason was charged with

---

[2]At the hearing on the defendant's motion for new trial, the prosecutor described a conversation with defense counsel wherein counsel for both the State and the defendant, upon inquiry by the trial court, agreed that proceeding to trial with the 12 jurors then seated would be of greater benefit to both sides than waiting for more potential jurors to arrive.  The defendant did not deny that this was, indeed, the case.  This conversation, however, and any participation by the trial court as intimated by the prosecutor was not transcribed and made a part of the record on appeal.  The failure to include this information further supports our conclusion that the defendant has waived our consideration of this issue.  The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."  Tenn. R. App. P. 24(b).  If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct.  *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993).

DUI and violating the implied consent statute. As in this case, the second count of the indictment containing the implied consent violation charge was taken to the jury room along with the first count of the indictment and some exhibits. *See id.*, slip op. at 2. The offending information was retrieved from the jury room, and the trial court questioned the jurors about the effect of the information on their deliberations. *See id.*, slip op. at 2-3. This court declared without analysis that "[t]here is no doubt that Count 2 of the indictment was extraneous, prejudicial information brought to the jury's attention," and, citing the limitation on questioning of jurors imposed by *Walsh v. State*, 166 S.W.3d 641 (Tenn. 2005), concluded that the State had failed to overcome the presumed prejudice. *Id.*, slip op. at 4-5.

Initially, we are not persuaded by the holding in *Mason* that the information contained in the second count of the indictment in this case qualifies as extraneous, prejudicial information. Although Tennessee Code Annotated section 55-10-406(a)(4)(A) arguably requires that implied consent violations be determined by the trial court rather than the jury, *see* T.C.A. § 55-10-406(a)(4)(A) ("If *the court* finds that the driver violated this subsection (a), except as otherwise provided in subdivision (a)(5), the driver shall not be considered as having committed a criminal offense; however, the court shall revoke the license of the driver . . . .") (emphasis added),[3] nothing in the statute prevents the jury's being made aware of the defendant's refusal to submit to blood alcohol testing, *see, e.g.*, *State v. Collins*, 166 S.W.3d 721 (Tenn. 2005); *State v. Lee Stanley Albright*, No. E2007-02671-CCA-R3-CD (Tenn. Crim. App., Knoxville, Dec. 8, 2008). Indeed, in this case, the second count of the indictment was read to the jury without objection by the defendant, and considerable evidence, including the video recording of the defendant's refusal and the defendant's own testimony that he had refused the test, was presented during the trial. Even assuming that the jurors saw the implied consent violation indictment, the document did not present the jury with any fact not already in evidence. For this reason, we remain unconvinced that the jury was exposed to extraneous, prejudicial information.

Moreover, the indictment in this case, unlike the one at issue in *Mason*, cannot be classified as "a written summary of a portion of the testimony of the primary prosecution witness." In addition, the trial court in this case specifically instructed the jury that the indictment was not evidence, and the jury is presumed to follow the instructions of the trial court. *See State v. Kiser*, 284 S.W.3d 227, 272 (Tenn. 2009). Under these circumstances, we have no trouble concluding that any error occasioned by the taking of the implied consent

---

[3]We note that panels of this court have reached different conclusions when considering whether an implied consent violation must be tried by the court or may be tried by the jury. *Compare Lee Stanley Albright*, slip op. at 4 (holding no error in permitting jury to determine implied consent violation) *with State v. Andrew Reginald MacKinnon*, No. E2009-00093-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Knoxville, Mar. 30, 2011) (vacating license revocation based upon jury's having determined implied consent violation).

violation indictment to the jury room was harmless.

*IV. Sufficiency*

The defendant challenges the sufficiency of the convicting evidence, arguing that the testimony of the defense witnesses established that the defendant was not intoxicated when he was stopped by Sergeant Henderson. The State contends that the evidence was sufficient to support the defendant's DUI conviction.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case,

It is unlawful for any person to drive or to be in physical control of any automobile . . . on any of the public roads and highways of the state . . . while:

(1) Under the influence of any intoxicant, marijuana, controlled substance, drug, substance affecting the central nervous system or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of himself which he would otherwise possess[.]

T.C.A. § 55-10-401(a)(1).

Viewed in the light most favorable to the State, the evidence adduced at trial established that the defendant consumed at least five and a half beers before getting into his car to follow Ms. Staples home from Crockett's. Despite the late hour, the defendant failed to turn on his headlights. He then crossed the center line on at least two occasions. He swayed on his feet while undertaking field sobriety tests, failed the tests themselves, and, according to Officer Smith, smelled of an alcoholic beverage. Although Officer Smith conceded that the defendant was not "falling down drunk," that level of intoxication is not required for a conviction of DUI. Moreover, although the defendant's expert witnesses questioned whether the defendant was, in fact, impaired, the jury, which saw and heard the witnesses as well as the video recording of the defendant's performance on the field sobriety tests, obviously accredited the testimony of the witnesses for the State. That was its prerogative. The evidence of the defendant's impairment presented by the State was sufficient to support his conviction of DUI. The defendant stipulated that he had the requisite prior convictions to establish that this was his third conviction of driving under the influence.

## V. Cumulative Error

Finally, the defendant contends that the cumulative effect of the errors at trial deprived him of the right to a fair trial. Although the trial court may have erred by permitting the second count of the indictment to be sent to the jury room, we have deemed any such error harmless. No other errors exist to contribute to cumulative error. *See State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed. . . .").

## VI. Conclusion

Because Sergeant Henderson had reasonable suspicion to stop the defendant's vehicle, the trial court did not err by denying the defendant's motion to suppress. The defendant waived our consideration of the trial court's provision of peremptory challenges. Although the trial court may have erred by permitting the implied consent violation indictment to be taken into the jury room during deliberations, any such error was harmless. The evidence adduced at trial was sufficient to support the defendant's conviction of DUI, third offense. Finally, no error existed to accumulate into a fair trial deprivation.

_____
JAMES CURWOOD WITT, JR., JUDGE